**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:19-cr-358-RC-MJS |
| DEMONTRA HARRIS, | |
| Defendant. | |

## <u>REPORT AND RECOMMENDATION</u>

Nearly five years ago, Demontra Harris pled guilty to one count of unlawful possession of a firearm by a convicted felon under 18 U.S.C. § 922(g)(1), and Judge Rudolph Contreras sentenced Harris to 46 months of imprisonment followed by 36 months of supervised release. About seven months into his term of supervised release, in March 2024, Harris was arrested and charged again with unlawful possession of a firearm by a convicted felon under Section 922(g)(1). Soon after, in April 2024, the U.S. Probation Office ("USPO") filed a petition alleging that Harris violated the terms of his supervision, including by unlawfully possessing a firearm and committing another crime. Judge Contreras referred this matter to the undersigned for a hearing on Harris's violations and for preparation of a report and recommendation on revocation. After careful review and for the reasons explained below, the undersigned **RECOMMENDS** that the Court **REVOKE** supervised release and **SENTENCE** Harris to a term of imprisonment of one month.

## BACKGROUND

### I.    The Underlying Criminal Case

On April 5, 2021, Mr. Harris pled guilty in this case to one count of unlawful possession of a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (ECF No. 93.) According to the statement of offense accompanying the guilty plea, on July 24, 2019, Mr. Harris discharged

a firearm four times in a residential neighborhood in Washington, D.C. (*See* ECF No. 94.)[1] On August 10, 2021, Judge Contreras sentenced Harris to 46 months of imprisonment (with credit for time served) followed by 36 months of supervised release. (*See* ECF No. 108.) This sentence was at the low end of the applicable guidelines range of 46 to 57 months, as calculated by the Court and acknowledged by the parties. (*See* ECF No. 115 at 7.) Harris's post-imprisonment supervision began on August 9, 2023, and it is scheduled to end on August 8, 2026. (ECF No. 133.)

## II.    The Instant Probation Petition

On April 8, 2024, USPO filed a petition alleging that Harris violated his supervised release conditions in this case by: committing one or more crimes while on supervision (Violation No. 1); possessing an unregistered firearm and ammunition (Violation No. 2); failing to participate in an approved domestic-violence program (Violation No. 3); failing to participate in an approved educational-services program (Violation No. 4); and failing to participate in an approved vocational-services program (Violation No. 5). (*See* ECF No. 133.) The first two violations stemmed from Harris's arrest by law enforcement in March 2024, which resulted in a new criminal case filed against Harris (Case No. 24-cr-180 (D.D.C.)), charging him with unlawful possession of a firearm by a convicted felon under 18 U.S.C. § 922(g)(1).

Based on the USPO petition, Judge Contreras issued an arrest warrant for violations of supervision, and Harris was arrested and appeared before a U.S. Magistrate Judge on April 15, 2024, at which time Harris conceded to detention pending resolution of the USPO petition. (*See* ECF No. 135; Min. Entry, Apr. 15, 2024.) Thereafter, Judge Contreras saw fit to trail revocation proceedings in this case pending further proceedings in the new criminal case. (*See* ECF No. 141.)

---

[1] At the time of the underlying offense in this case, Harris had a prior felony conviction for carrying a pistol without a license, *see* D.C. Code § 22-4504, in D.C. Superior Court Case No. 2018 CF2 015308. Alongside his supervised release in this federal case, Harris is still being supervised on that prior D.C. case, too.

**III.    Harris's Ensuing Guilty Plea and Sentencing (Case No. 24-cr-180)**

In Harris's new case, he ultimately pled guilty in January 2025 before Judge Amit Mehta to one count of unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). According to the statement of offense accompanying that guilty plea, on March 1, 2024, Harris ran a red light while operating a vehicle, and he promptly lost control, crashed, and then ran from the scene. In responding to the vehicle, the police spotted a firearm in the driver's seat. The police also found one distinctive shoe on the floor of the driver's side and recovered a D.C. Driver's License and other identifying documents from the vehicle that all bore the name, "Demontra Harris." The police also found an opened and nearly empty bottle of tequila in the front area of the car. Soon after, police identified and approached an individual in the nearby area wearing only one shoe, who identified himself as Harris. (*See generally* No. 24-cr-180 (D.D.C.), ECF No. 23 (Jan. 16, 2025).) On October 20, 2025, Judge Mehta sentenced Harris to 24 months of imprisonment (with credit for time served) followed by 36 months of supervised release. (*See* No. 24-cr-180 (D.D.C.), ECF No. 37; Min. Entry, Oct. 20, 2025.) Judge Mehta's sentence represented a downward variance below the sentencing guidelines range of 30 to 37 months, in part because of Harris's positive strides during the pendency of the case, and in part because Harris was facing additional time for supervised release violations (both in this case and before the U.S. Parole Commission stemming from his earlier conviction in D.C. Superior Court).

**IV.    Additional Proceedings (Case No. 19-cr-358)**

Back in this case, in December 2025, Judge Contreras referred the matter to a U.S. Magistrate Judge for a hearing on revocation of supervised release and for preparation of a report and recommendation. (Min. Order, Dec. 24, 2025.) The case was referred to the undersigned, and the Court promptly scheduled a preliminary revocation hearing for January 20, 2026.

Before that hearing date, though, Harris's counsel filed a consent motion for "release from custody" on January 12, 2026. (ECF No. 143.) The motion did not seek "release" in the traditional sense but instead asked the Court to issue an order that would facilitate Harris's ability, while remaining in custody, to be presented to the U.S. Parole Commission to resolve the parallel supervised release proceedings stemming from his D.C. Superior Court case. (*See id.*) According to the motion, absent an attempt to proceed in that fashion, recent experience suggested that Harris would not even be presented to the Parole Commission until the conclusion of any additional sentence imposed by the Court in this case. The aim of the motion, then, was to facilitate Harris's ability to begin—and hopefully even complete—his parallel revocation proceedings before the Parole Commission, including as to any resulting sentence, so this Court could craft its sentence with the benefit of that information. This Court granted that motion and issued an order to transfer Harris "from the custody of the U.S. Marshals to that of the Parole Commission … for resolution of the outstanding U.S. Parole Commission warrant against him." (ECF No. 144.) As the Court noted, the goal was to "allow Mr. Harris to have his supervised released violation before the U.S. Parole Commission resolved, thereby obviating the risk that a pending Parole Commission detainer would limit [his] access to potential halfway house placement, earned good time credit, [and] available programming and treatment programs while serving his sentence in this case." (*Id.*)[2]

---

[2] Although a detailed discussion of the U.S. Parole Commission is beyond the reach of this ruling, the Court provides a quick overview for context's sake. In the 1980s, Congress "eliminated most forms of parole in favor of supervised release, a form of postconfinement monitoring overseen by the sentencing court, rather than the Parole Commission." *Johnson v. United States,* 529 U.S. 694, 696–97 (2000). In doing so, Congress began to phase out the Parole Commission, although it has repeatedly extended that sunset provision over the years. Relevant here, in 1997, Congress *expanded* the Commission's ambit in one key respect: it abolished the D.C. Board of Parole and transferred to the Parole Commission the responsibility of overseeing the parole of offenders who committed felonies under the District of Columbia Code. *See* D.C. Code § 24-131(a); *John Doe v. U.S. Parole Comm'n*, 602 F. App'x 530, 531 (D.C. Cir. 2015) ("Pursuant to the National Capital Revitalization and Self–Government Improvement Act of 1997 … , District of Columbia offenders … are subject to the authority of the United States Parole Commission until completion of the term of supervised release.") (cleaned up). In carrying out that charge, the Parole Commission generally exercises "the same authority as is vested in the United States District Courts by 18

That process did not exactly play out as anticipated. According to defense counsel, the Parole Commission did not commence any formal proceedings based on this Court's order, but it did engage on some level by presenting Harris with an expedited plea offer to resolve any supervised release violations in his D.C. Superior Court case. The plea offer included a sentence of imprisonment at 10 months above the Parole Commission's guidelines range (which counsel advises would be 18 to 24 months). Under that plea offer, then, Harris is facing a sentence of imprisonment of 34 months, subject to credit for time served on Judge Mehta's sentence in the latest case—which reportedly totals around 22 months of time served after good-time credits and other adjustments—leaving a net sentence from the Parole Commission of right around 12 months. In other words, assuming Harris accepts the plea offer, he will serve a one-year sentence.

Relatedly, this Court is advised that the Parole Commission will not credit Harris for any time served after he completed his sentence in Case No. 24-cr-180—*i.e.*, from November 27, 2025 forward—because the Parole Commission takes the view that such time should only be credited toward any sentence imposed in the instant case. And more broadly, under the Parole Commission's current practices as explained to the Court, the Parole Commission will generally not run its sentence concurrently with any additional sentence this Court might impose.[3]

---

U.S.C. § 3583(d)–(i)." D.C. Code § 24-403.01(a)(6). The Parole Commission is intended to be led by five individual Commissioners, but there is currently only one in place, which means a single individual exercises ultimate control over all revocation and sentencing decisions for D.C. offenders. And more broadly, as the defense submission here details, the Parole Commission has received its share of criticism in this context, including based on statistics reflecting higher rates of imprisonment on supervised release violations, at sentences above comparable ranges imposed in the federal system. (ECF No. 147 at 7–10 (citing and discussing, among other sources, Criminal Justice Coordinating Council, *Parole and Supervised Sanctions Report* (Sept. 2023) at 5, https://perma.cc/DK6T-WYZQ.) This Court expresses no view on that debate except to flag its existence and to contextualize the dynamics affecting individuals like Harris, who face dueling revocation proceedings in this Court and before the Parole Commission for the same violations.

[3] Though not controlling, neither the government nor UPSO disagreed with any of these characterizations, whether in any written submission or during either of this Court's hearings on these matters.

On March 6, 2026, the Court held a preliminary revocation hearing. Harris admitted to Violations 1 and 2 of the USPO petition (understandably, given his guilty plea in Case No. 24-cr-180). USPO, in turn, withdrew Violations 3 through 5. The parties submitted sentencing submissions a couple weeks later. USPO proposes a significant sentence of 24 months of imprisonment, which would be double the high end of the guidelines range. (ECF No. 145.) The government proposes a lesser sentence of 6 months of imprisonment—at the bottom of the guidelines range. (ECF No. 148.)[4] And for Harris's part, defense counsel seeks a somewhat unorthodox sentence of one day of imprisonment. The rationale for that request is as follows: Because Harris's U.S. Parole Commission sentence will result in at least one year of incarceration—a point the defense says is clear by virtue of the terms of the expedited plea offer recently extended by the Parole Commission—a sentence from this Court to one day of imprisonment would allow the clock on Harris's forthcoming Parole Commission sentence to start on November 29, 2025; from that point forward, Harris would end up serving a full year of imprisonment combined on his two revocation proceedings, with an anticipated release date in November or December 2026. (*See* ECF No. 147 at 1–2, 17–18.) No interested party requests an additional period of supervised release following any term of imprisonment (presumably because Harris is already subject to a three-year supervised release term in Case No. 24-cr-180).

This Court held a final revocation hearing on March 26, 2026, inviting additional argument from counsel and USPO. Afterward, the Court took the matter under advisement.

---

[4] According to the government, it committed to this recommendation as part of Harris's most recent plea agreement. (ECF No. 148 at 1 n.1; *see also* No. 24-cr-180 (D.D.C.), ECF No. 22 at 5 (Jan. 16, 2025).)

**DISCUSSION**

18 U.S.C § 3583 governs the revocation of supervised release. In general, courts "may" revoke a term of supervised release after finding "by a preponderance of the evidence that the defendant violated a condition of supervised release[.]" *Id.* § 3583(e)(3). But the statute *mandates* revocation upon a finding of certain categories of violations, including if a defendant "possesses a firearm … in violation of Federal law, or otherwise violates a condition of supervised release prohibiting the defendant from possessing a firearm[.]" *Id.* § 3583(g)(2) (specifying that the court "shall revoke the term of supervised release and require the defendant to serve a term of imprisonment" in that circumstance and a few others). Here, all agree that this case presents a mandatory revocation scenario, so the Court *must* revoke Harris's supervised release and impose some sentence of imprisonment. The remaining issue is what sentence should follow.

In determining an appropriate sentence, Section 3853(c) calls on courts to consider the traditional sentencing factors enumerated in 18 U.S.C. § 3553(a), *except* for subsections (a)(2)(A) and (a)(3). *See* 18 U.S.C. § 3583(c). These relevant factors include: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the need to "afford adequate deterrence"; (3) the need to "protect the public from further crimes of the defendant"; (4) the need to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (5) the particular sentencing guideline range and any "applicable guidelines or policy statements" issued by the U.S. Sentencing Commission; (6) the "need to avoid unwarranted sentence disparities"; and (7) the "need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(1), (a)(2)(B)–(D), and (a)(4)–(7). In crafting a sentence based on these factors, a "court shall impose a sentence sufficient, but not greater than necessary" to serve the stated objectives. *Id.* § 3553(a).

On the specific circumstances here, the undersigned believes the relevant sentencing factors—at least when viewed alongside the Parole Commission's forthcoming, separate punishment for Harris's supervised release violations in his other case, based on the same underlying conduct as here—are appropriately served by a sentence far closer to the defense's proposal than the others: namely, one month of imprisonment. As a practical matter, between this proceeding and the parallel Parole Commission proceeding, a one-month sentence here would mean Harris will serve approximately 12 or 13 months of imprisonment for his collective breaches of trust on supervised release. *See, e.g.*, *United States v. Johnson*, 2025 WL 1828322, at *2 (D.D.C. July 1, 2025) ("When imposing a sentence on a defendant who has violated conditions of supervised release, a court punishes the individual for his or her breach of trust.") (citing *United States v. Hammons*, 558 F.3d 1100, 1104 (9th Cir. 2009)), *report and recommendation adopted*, 2025 WL 1824840 (D.D.C. July 2, 2025). Specifically, if the Court adopts this recommendation, Harris's one-month sentence in this case would run from the end of November 2025 through the end of December 2025, at which point the clock would be expected to start on Harris's forthcoming Parole Commission sentence, resulting in a projected release date in December 2026. The undersigned believes this sentence, viewed holistically, appropriately serves the ends of justice and is "sufficient, but not greater than necessary" to fulfill the relevant statutory objectives.

Starting with the first factor, the nature and circumstances of the offense here are weighty. As supervised release violations go, the commission of a new federal offense through the unlawful possession of a firearm undoubtedly falls on the more serious side of the spectrum. And more than that, the reckless circumstances surrounding Harris's admitted violation—*i.e.*, driving while intoxicated, while in possession of a loaded firearm—are concerning.

8

Harris's history and characteristics, though, are more nuanced. On the one hand, Harris's latest offense represents his third firearms-related conviction. But on the other hand, Harris's progress during the pretrial process in his latest case reflects meaningful and significant strides toward improving himself and his circumstances. Harris acknowledged his struggles with alcohol abuse and began to work through those issues, including by completing the Residential Substance Abuse Treatment ("RSAT") Program while at the D.C. Jail's Central Treatment Facility ("CTF"). In fact, even though Harris already completed the program, he continues to participate as a mentor to other—generally younger—participants. More broadly, Harris has taken advantage of a broad range of programming available through CTF, including classes on anger management, healthy living, and parenting and life skills. And he completed several vocational classes, including courses focused on occupational safety and health, commercial driving, and plumbing—all while taking substantial steps toward completing his GED. These efforts, coupled with the newfound perspective Harris shared with the Court (through a video exhibit and in person during his allocution), reflect a somber and focused effort by Harris to improve himself, including for the sake of his two school-age children.[5] In the Court's view, Harris's recent actions—and not simply his mistakes of the past—are a strong indicator of Harris's character and his perspective moving forward. *See, e.g.*, *Johnson*, 2025 WL 1828322, at *2 (crediting the "compelling" facts surrounding a defendant's participation in vocational, educational, and reentry programs); *cf. United States v. Wright*, 549 F. Supp. 3d 122, 126–27 (D.D.C. 2021) (weighing favorably, in the context of a compassionate release request, a defendant's efforts to assist other prisoners in various

---

[5] According to the defense, the time that Harris spent at CTF while detained pretrial in his latest case represented his first concrete chance to take advantage of these sorts of resources and programming opportunities. While in the Bureau of Prisons previously, "he was offered next to no programming, other than a GED class that was often interrupted by lockdowns." (ECF No. 147 at 3–4.) This context, the Court agrees, helps to show the meaningfulness of Harris's more recent accomplishments.

ways, reflecting a "focus on bettering himself and fellow inmates"). In short, while the nature and circumstances of the violation here are certainly on the serious side, this should be balanced against Harris's history and characteristics, including his meaningful rehabilitative progress overall.

As to factor two, the Court agrees that some deterrent effect here is important, especially given Harris's track record of repeated firearms offenses. And on top of specific deterrence as to Harris, the Court agrees with the need for some general, public deterrence to others. To those ends, the Court believes some sentence of imprisonment is warranted due to Harris's breach of trust while on supervised release, but the Court is mindful that Harris's underlying sentence of imprisonment on the new offense itself goes a long way toward carrying out that deterrent effect. And the Court's recommended sentence now—certainly when viewed alongside Harris's forthcoming punishment from the Parole Commission—ought to drive that goal home.

As to factors three and four—protecting the public from further crimes by Harris and providing him with appropriate training and treatment—the Court returns to the breadth of programming and educational opportunities Harris sought out during his recent pretrial period. Harris's concerted efforts to address his substance abuse issues should go a long way toward protecting the public from future crimes that stem from reckless alcohol abuse. And the undersigned believes the Court's sentence should increase the prospects that Harris can continue with comparable programming and training moving forward. Subjecting Harris to even more extended and unnecessarily duplicative incarceration would only detract from those goals.

Turning to factor five, all agree that Harris's violations are "Grade B violations," which, when coupled with Harris's criminal history category at the time he was originally sentenced in

this case, reflect a guidelines range of 6 to 12 months of imprisonment. *See* USSG § 7B1.1(a)(2).[6] These guidelines, of course, are merely advisory. *See, e.g.*, *United States v. Turner*, 21 F.4th 862, 864 (D.C. Cir. 2022). Viewed in isolation, the Court's recommended sentence falls below the guidelines range. But viewed alongside the punishment Harris faces from the Parole Commission, which is tied to the same underlying conduct as here, Harris is virtually certain to face imprisonment at or above the high end of that range. As explained, the expedited plea offer from the Parole Commission would require Harris to serve a term of imprisonment of approximately 12 months. And although Harris has not yet formally accepted that plea offer, the defense persuasively asserts that Harris would see no real benefit by rejecting it and proceeding to a full revocation hearing before the Commission. Given Harris's guilty plea in his latest case, he has no real basis to oppose the merits of the supervision violations (just as was true here), and the Commission's sentence would almost certainly exceed the plea offer it extended him already—perhaps especially so if this Court adopts the modest one-month sentence recommended here.

Finally, the sixth and seventh factors have limited bearing. Neither side points the Court to any potential sentencing disparities that would result from its proposed sentence, and there are no real restitution-related considerations in play—certainly none flagged by the parties.

On balance, the defense fairly captures the crux of the issue in framing the relevant question as follows: "[I]s there a legitimate purpose for this Court to sentence [Harris] to a period of six months"—*i.e.*, at the low end of the guidelines range, as proposed by the government—"that will be served consecutively" to the additional year of imprisonment that Harris faces in sentencing before the U.S. Parole Commission? (ECF No. 147 at 17–18.) The undersigned thinks not. If Harris

---

[6] In its original petition, USPO classified Harris's highest alleged violation as a Grade A violation. (ECF No. 133 at 3.) But in its sentencing recommendation, USPO acknowledged that the highest-level violation here is Grade B (ECF No. 145 at 1 n.1), and USPO reaffirmed this view at the final revocation hearing.

11

were sentenced to six months in this case, the practical interaction of that sentence with the forthcoming Parole Commission sentence would mean Harris would ultimately serve about 18 months for his supervised release violations across both cases. That would be *three times* the six-month sentence the government seeks here, and it would be tantamount to a significant upward departure from the high end of the applicable guidelines range.

Unfortunately, the undersigned does not believe the Court can blunt those consequences simply by imposing a sentence that would run concurrently with the Parole Commission's sentence because the Parole Commission's current practices reflect that it is not likely to honor that approach. Instead, the undersigned shares the defense's view that the imposition of a six-month sentence in this case would mean the clock on Harris's Parole Commission sentence would almost certainly start in late May 2026—after accounting for that six-month stretch—such that Harris would not be released until May 2027 (or possibly later). That outcome would frustrate, rather than uphold, the goals of sentencing in this context. It would risk hampering and possibly even derailing Harris's substantial rehabilitative progress to this point. Harris is going to be separately punished by the Parole Commission for committing his latest crime while on supervision—and with a sentence of imprisonment at the high end of the sentencing guidelines that apply here, to boot. The Court believes that substantial sentence largely fulfills the necessary sentencing objectives here, too, without unduly punishing Harris twice for the same overall misconduct. *Cf. United States v. Nwenze*, 2024 WL 4608867, at \*5 (D.D.C. Oct. 24, 2024) ("The D.C. Parole Commission has already punished Mr. Nwenze for committing a crime while on supervision. Sentencing Mr. Nwenze to an additional period of incarceration for the very same reason would effectively repeat the punishment for committing the underlying offense while on supervision."), *report and recommendation adopted*, 2024 WL 4810903 (D.D.C. Nov. 18, 2024).

All that said, the undersigned does believe some modest period of imprisonment that is independently attributable to Harris's supervised release violation in this case—separate and apart from any sentence in the Parole Commission matter—is appropriate. After all, in focusing on Harris's breaches of trust in committing the serious violations at issue here, the fact remains that Harris breached his trust-based obligations in two separate, albeit substantially overlapping, ways: he breached the trust extended by this Court, and he separately breached the trust extended through his supervised released terms in his D.C. Superior Court case. Chalking up the former to "time served," or what amounts to the functional equivalent of "time served" (one day's imprisonment), would unduly minimize the matter, especially considering the serious nature of the violations at issue. More, as noted above, in varying below the guidelines range when sentencing Harris on the new violations, Judge Mehta explained that result by referencing the fact that Harris was facing additional time for his supervised release violations, both in this case and before the Parole Commission. Some sentence of imprisonment here accords with that rationale.

All told, the undersigned believes a sentence of one month of imprisonment strikes the appropriate balance amid the multifaceted considerations at play here.

## CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that Harris's supervised release be **REVOKED** and that the Court **SENTENCE** him to one month of imprisonment with no additional period of supervised release.[7]

Dated: April 8, 2026

MATTHEW J. SHARBAUGH
United States Magistrate Judge

---

[7] For avoidance of doubt, this sentence should run *consecutively* to Judge Mehta's sentence on the new offense itself. But the undersigned recommends that the sentence run *concurrently* with any sentence imposed by the Parole Commission in Harris's revocation proceedings on his D.C. Superior Court matter, even though it remains to be seen whether the Parole Commission will honor that characterization.

\*     \*     \*

The Court hereby advises that, pursuant to 28 U.S.C. § 636(b)(1)(C) and LCrR 59.2(b), any party who objects to a report and recommendation must file a written objection within fourteen (14) days of the party's receipt of the report and recommendation. The written objections must specifically identify the portion of the report or recommendation to which objection is made and the basis for such objections. Failure to file timely objections to the findings and recommendations set forth in this report may waive that party's right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985)